**Donald URBAN, Plaintiff,**

v.

**Louis M. SULLIVAN, M.D., Secretary of Department of Health and Human Services of the United States of America, Defendant.**

No. 91–1211.

United States District Court, C.D. Illinois.

July 8, 1992.

910

Norman L. McGill, G. Douglas Stephens & Assoc., Peoria, Ill., for plaintiff.

K. Tate Chambers, Asst. U.S. Atty., Peoria, Ill., for defendant.

## ORDER

McDADE, District Judge.

Before the Court is Plaintiff's Motion for Summary Reversal (Doc. # 7, Part 1) and Defendant's Motion to Affirm (Doc. # 10, Part 1). For the reasons stated below, the Plaintiff's Motion for Summary Reversal is denied, and the Defendant's Motion to Affirm is granted.

## PROCEDURAL HISTORY

On November 30, 1989, Plaintiff Donald Urban applied for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423. (AR 51)[1]. Plaintiff alleged that he became unable to work on August 26, 1985. *Id.* Plaintiff claims that he is disabled based upon degenerative disc disease, back pain and numbness of the hands. Plaintiff's application was denied initially and upon reconsideration. (AR 55, 60). A hearing was held before Administrative Law Judge Paul E. Webster on September 5, 1990. (AR 19). On December 17, 1990, the ALJ issued his decision denying benefits, and the Appeals Council subsequently denied review. (AR 6–7, 11–15). Plaintiff then brought this action seeking reversal of the Secretary's decision.

## THE LEGAL STANDARDS

In order to be entitled to disability benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Social Security Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir.1980). That factual determination is made by using a five step test. *See* 20 C.F.R. §§ 404.-1520, 416.920.

The five step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy? An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir.1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Secretary to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir.1985); *Halvorsen v. Heckler*, 743 F.2d 1221, 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Pitts v. Sullivan*, 923 F.2d 561 (7th Cir.1991). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole,

---

1. AR refers to the Administrative Record before the district court on review.

contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls upon the Secretary (or the Secretary's designate, the ALJ)." *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987)). Credibility findings made by the ALJ are entitled to considerable deference, and will be affirmed unless claimant can show that they are "patently wrong." *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir.1989).

## BACKGROUND

Plaintiff Donald Urban was born on October 10, 1932. (AR 51). He has an eighth grade education. (AR 72). Plaintiff is 5' 10" and weighs approximately 200 pounds. (AR 68). Plaintiff worked at Caterpillar Inc. until August 26, 1985, when he suffered an injury to his back at work. (AR 68). Plaintiff has been on medical leave since that date. From 1965 to 1982, Plaintiff operated an automatic lathe machine. (AR 76). From 1982 to 1985, Plaintiff operated a gear cutting machine. *Id.*

On August 27, 1985, Plaintiff was hospitalized[2] due to low back pain when he wrenched his back at work. (AR 116). Plaintiff denied any numbness in the legs, any weakness, or any bladder or bowel difficulties. *Id.* The physical examination revealed "a 52 year old gentleman in no acute distress." *Id.* Plaintiff's gait was unremarkable. *Id.* Plaintiff favored his back when he walked and had a straight back. *Id.* Plaintiff had diminished forward flexion with paravertebral muscle spasm. He had normal toe and heel walking and normal strength to the lower extremities. *Id.* Straight leg raising caused some back pain at approximately 40 degrees bilaterally, but the Patrick-fabere maneuver was negative. *Id.* The physi-

cian's assessment was that Plaintiff suffered from lower back pain, and the plan was for bed rest. *Id.*

Dr. Russo subsequently examined Plaintiff. (AR 117). Dr. Russo's notes of examination state, in relevant part:

EXAMINATION: Reveals a well-developed white male who appears to be mildly uncomfortable. The examination of the lumbar spine reveals some diffused guarding in the paraspinal musculature. There is also some mild diffuse tenderness in the lumbar paraspinals and lumbosacral junction. There is no sciatic notch tenderness. The range of motion of the lumbar spine is only about 25% normal in all planes with discomfort on the extremes of motion. The straight-leg-raising is tolerated to about 50 to 60 degrees with complaints of pulling back discomfort and tightness in the hamstring muscles. The deep tendon reflexes at the knees and ankles are brisk and symmetrical. There is no demonstrable weakness or atrophy in either lower extremity. The sensory exam was unremarkable. This gentleman moves about in a very guarded fashion when standing or taking any steps. Verbal report of X-ray films reveals some minimal degenerative changes with some anterior spurring at the L3–L4 and L4–L5 levels.

IMPRESSION: 1. Acute musculoligamentous strain of the lumbosacral spine.

RECOMMENDATIONS: At the present time will begin this gentleman on a therapy program geared primarily towards decreasing his pain, muscle spasm and trying to remobilize him. Once this gentleman's needs have decreased and his mobility has improved, will investigate the possibilities of trying to get him maintained on an outpatient program.

The report regarding the x-rays taken August 27, 1985, states that Plaintiff suffered from slight hypertrophic arthritis of the lumbosacral spine. (AR 120). Plaintiff had normal lumbar lordosis—the pedicles and intervertebral joint spaces were intact, although liminal osteoarthritic changes

2. The medical report notes that Plaintiff had suffered a similar episode a year earlier and

was hospitalized for weeks and spent months off work. *Id.*

were evident, primarily in the form of slight spurring. *Id.* Anteriorly, L–3–4–5 had more evident involvement extending anterolaterally from the rostral aspect of the vertebral centrum, L–3. *Id.* The paravertebral soft tissue detail was unremarkable in appearance. *Id.* The report notes that "[t]he lumbar spine is unremarkable in appearance for patient age and habitus. Liminal osteoarthritic changes are evident, most evident, rostral aspect, anterolaterally, centrum, L–3." *Id.*[3]

A magnetic resonance imaging (MRI) test performed September 11, 1985, showed degenerative disc disease at the L5–S1 level and a lesser loss of signal at the L4–5 disc. (AR 121). Posterior disc bulge was noted at L5–S1 but an extruded fragment was not found at this level. *Id.* There was minimal posterior disc bulge at the L4–5 and L3–4 levels. At the L2–3 level there was a large extruded fragment posteriorly, centrally and to the left of the midline. *Id.* A myelogram performed the same day showed an apparent L2–3 small disc herniation. *Id.* There also appeared to be some widening and flattening of the L3 nerve root on the left. *Id.* No other abnormality to the lumbar metrimazide myelogram was noted. *Id.*

Plaintiff was again hospitalized in February of 1986. (AR 127). The reports of the visit were written by Dr. Margetts, on behalf of Dr. Hanigan. (AR 127–31). Apparently, on January 14, 1986, Plaintiff again had an MRI which showed the ruptured disc at the L2–3 level. *Id.* Plaintiff was admitted to the hospital to undergo myelographic study. *Id.* The physical examination revealed that Plaintiff was able to forward flex to 90 degrees without pain, and on spine position, both right and left straight leg raising tests were negative at

90 degrees. *Id.* Sensory examination of the extremities revealed light touch, pinprick, cold, joint, position and sensation all to be within normal limits. *Id.* The repeat lumbar myelogram was significant only for minimal posterior disc bulging at the L2–3, L3–4, L4–5 levels, as well as asymmetrical filling of the right L5 nerve root as compared to the left one, which did not appear to be related to extrinsic compression. *Id.* The posterior disc bulging was not as marked as visualized on the previous myelographic study.[4] *Id.* Plaintiff was able to heel and toe walk very well. (AR 130).

Lumbosacral spine films showed minimal degenerative osteophyte formation within the mid lumbar spine. (AR 127, 137). Electromyographic and nerve conduction velocity studies revealed no definite abnormal EMG findings in the lower extremities or paraspinal muscles, including the L2–S2 myotomes. Nerve conduction findings were within normal limits also, including femoral nerves.[5] *Id.* The history and physical report states that "[t]he patient's current history, including the absence of lower back pain and anterior thigh pain currently, as well as his clinical examination, does not currently suggest a radicular syndrome." (AR 131). The discharge report states that "[i]t is felt that patient's lower back pain, which was extremely variable during his admission, is the result of degenerative changes." *Id.* Plaintiff was to undergo physical therapy with Dr. Russo, and was to consult Dr. Hanigan in six months. *Id.*

Dr. Russo described Plaintiff as "a well developed white male who does not appear to be in acute distress." (AR 132). Examination of the lumbar spine revealed an essentially normal lumbar lordosis. *Id.* There was some tenderness on palpation

---

**3.** The discharge report of 8/30/85 notes that the patient strained his back while at work and was admitted because of the severity of his pain. (AR 126). During the hospitalization, Plaintiff also began to complain of anterior thigh pain. (AR 12). He was kept on bed rest until he felt more comfortable and was then discharged. (AR 126).

**4.** The myelogram report states that "[t]he lateral view demonstrates minimal posterior disc bulg-

ing at the L2–3, L3–4 and L4–5 levels. The degree of posterior disc bulging at the L2–3 level and L4–5 level has significantly decreased when compared to the previous study 9–85." (AR 138).

**5.** Dr. Truong, who conducted these tests, noted that Plaintiff showed no definite pain on moderate movements of the back. (AR 134).

over the lumbar paraspinals, and some tenderness on percussion in roughly the L-3/L-4 level. *Id.* Range of motion of the lumbar spine was about 75–80% of normal, with complaints of mild, pulling discomfort on the extremes of motion. *Id.* Straight leg raising was with complaints of hamstring discomfort bilaterally. *Id.* Plaintiff's gait pattern was normal. *Id.* Dr. Russo noted that X-ray studies of the lumbosacral spine, in addition to the myelogram, reportedly showed some evidence of degenerative change at the L-2/L-3 and L-3/L-4 levels. *Id.* Dr. Russo believed that Plaintiff suffered from degenerative disc disease of the lumbar spine, with evidence of mild bulging at the L-2/L-3 and L-3/L-4 levels on the myelogram, and planned to initiate physical therapy. (AR 133).

On March 11, 1987, Plaintiff again took an MRI test. (AR 150). Dr. Bishop noted that there was mild posterior bulging of all of the discs L-2 to S-1, and found degenerative disc disease of the lumbar spine from L-2 through S-1. *Id.* There was no evidence of an intervertebral disc herniation. *Id.* Beginning in February of 1987, Plaintiff was seen by Dr. DeBord of the Midwest Urological Group, Ltd. for urinary and prostate problems, which are not the subject of this appeal with respect to Plaintiff's claim for disability benefits. Dr. DeBord referred Plaintiff to Dr. Stanley Koch, who apparently examined Plaintiff for a heart condition and treated his high cholesterol. There is no evidence that Dr. Koch examined Plaintiff with respect to his back problems, although an apparent chest x-ray revealed that mild osteoarthritic changes were seen in the lower thoracic spine and a mild scoliosis was seen in the midthoracic spine with convexity of the curve to the right. (AR 164). On July 29, 1989, Dr. Koch wrote a letter to American Union Life Insurance Company stating that "Mr. Donald Urban has degenerative disc disease of the lumbar spine with chronic back pain. He is disabled because of this and is unable to adequately perform the duties of any significant occupation." (AR 155). Apparently, this letter was based primarily on Plaintiff's reports of chronic

lower back pain with radiation to the legs. (AR 157, 158).

On December 12, 1989, Plaintiff was examined by Dr. Rabinowitz, a medical consultant designated by the Secretary. (AR 168). Plaintiff's chief complaints were listed as 1) cholesterol elevation; 2) chest pain; 3) prostate problems; 4) back pain; and 5) abdominal pain. *Id.* With respect to the back pain, Dr. Rabinowitz noted that Plaintiff made the following complaints:

The patient complains of intermittent lower back pain which radiates to the anterior legs and down the feet, producing numbness and cramps in the feet. The patient has difficulty walking because of this ... The patient has difficulty with repetitive bending, lifting more than 25 pounds, standing, sitting or walking for prolonged periods of time, but is able to perform the usual activities of daily living. *Id.*

Dr. Rabinowitz's physical examination of Plaintiff revealed a decreased range of motion testing of the lumbar spine accompanied by paravertebral muscle spasm and pain. (AR 170–171). Straight leg raising was positive at 75 degrees bilaterally, but was referred to the thighs posteriorly. (AR 170). The patient was able to ambulate without the use or need of an assistive device, and gait testing was normal. (AR 171). Grip strength and digital dexterity were unimpaired, and the patient had no difficulty getting on and off the operating table. *Id.* Plaintiff had mild difficulty with heel-and-toe walking and squatting. *Id.* There was no evidence of nerve root irritation. *Id.* Dr. Rabinowitz believed that Plaintiff suffered from degenerative disc disease. *Id.* A December 6, 1989, report from Suburban Radiology Systems stated that there was some mild intervertebral disc spacing narrowing at L5–S1; the remaining intervertebral discs by comparison were normal. (AR 172). The report also notes some mild degenerative changes involving the apophyseal joints at L5–S1 bilaterally but that the lumbar spine was otherwise unremarkable. *Id.*

On December 20, 1989, Dr. James Graham, a medical consultant designated by

the Secretary, reviewed the medical evidence of record and filled out the Residual Physical Functional Capacity Assessment form. Dr. Graham is a physician licensed in 1934, and a member of the American Specialty Board of Surgery. (AR 113). His medical specialty is colon and rectal surgery. *Id.* Dr. Graham determined that Plaintiff suffered from degenerative disc disease and hypercholesterolemia. (AR 104). Based on review of the medical evidence, and taking into account Plaintiff's complaints of back pain, Plaintiff's normal neurological tests, and the fact that the x-rays showed the changes in his back condition to be minimal, Dr. Graham nonetheless found that Plaintiff had the capacity to occasionally lift up to 50 pounds, and to frequently lift and carry 25 pounds, that he could stand, walk, or sit for a total of six hours in an eight hour work day, and had an unlimited capacity to push and pull, other than as shown with respect to lifting and carrying. (AR 105). Dr. Graham determined that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (AR 106–8). Dr. Graham's additional comments indicate that his opinion was based on the medical evidence of record; and with respect to Plaintiff's complaints of pain, Dr. Graham stated that "normal neurologic and unremarkable x-ray for age indicates that pain should be minimal and that spinal motion should not be less than normal." (AR 111).[6] On March 6, 1990, Dr. Graham again performed a RFC assessment and concluded that his initial determination remained unchanged.

Plaintiff initially described his job duties as a lathe operator as requiring him to stand eight hours a day, walk four hours a day, with frequent bending and no sitting. (AR 77). Plaintiff stated that he had to carry tools and forgings ten to fifteen feet, and that the heaviest weight that he lifted was 100 pounds, while the weight he frequently lifted or carried was up to 25 pounds. *Id.* Plaintiff's job as a gear hobber required the same type of exertion,

except that Plaintiff was required to walk five hours out of the eight hour work day. (AR 78). At the hearing before the ALJ, Plaintiff stated that as a lathe operator, he lifted some very heavy pieces, up to 50 or 60 pounds. (AR 29). Plaintiff admitted that he had a hoist to lift the pieces with but that he lifted the pieces by hand to make production. (AR 30). He did, however, have to lift 25 to 30 pound tooling to make the setups with that he could not use the hoist on. *Id.*

On December 26, 1990, Jim Anderson, a vocational assessment specialist, issued an opinion based on Dr. Graham's assessment as to Plaintiff's residual functional capacity, that Plaintiff could not be expected to perform either of his prior jobs as automatic lathe operator or gear hobber operator as he described the work prior to the hearing. (AR 82). Anderson noted that as Plaintiff described his prior work, it was heavy work. *Id.* However, Anderson noted that Plaintiff's description of the lathe operator job closely resembled the Engine Lathe Set-up Operator (machine shop) (604.-380–018) in the Dictionary of Occupational Titles. *Id.* According to the Supplement to the Dictionary, the job requires only medium work activity as it is generally performed in the national economy. *Id.* Anderson therefore concluded that since Plaintiff could be expected to perform this work as it is generally performed in the national economy, he could not be considered disabled. *Id.*

The ALJ also consulted vocational expert Richard Erickson and posed the following hypothetical question to him:

Please assume the following hypothetical situations: 58 year old man who is closely approaching retirement age. He worked previously as a very skilled machinist who worked to extremely close tolerances of $+/- \frac{1}{10,000}$th of an inch, operating complex machine tools, gear cutters, and lathes. These were operated at a medium level of exertion and he can no longer exert that much lifting.

---

**6.** The initial disability determination denying Plaintiff's claim lists A.M. Lindsay as the medical specialist or physician. (AR 103). The sec-

ond disability determination form lists Dr. Edwin A. Lee as the medical specialist or physician. (AR 94).

He is limited to light lifting. Are there any skilled or semi-skilled jobs, at either the light or sedentary level of exertion, which he could do with little or no vocational re-adjustment. These jobs must be skilled or semi-skilled, and not any of the jobs already considered in the medico-vocational guidelines, but light and sedentary work outside those guidelines. Erickson responded as follows:

This individual has worked primarily in the heavy equipment manufacture industry as an operator of various machines involving setup, adjustment, feeding/off-bearing and working with prescribed standards. Within this industry the majority of these jobs require medium or heavy physical demands. Although machine operator jobs requiring light physical demands exist in other industries, in view of his age and the vocational adjustments required to transfer to another industry, I am of the opinion that a significant number of jobs do not exist for the described individual.

### THE ALJ'S FINDINGS

The ALJ followed the five-step sequential evaluation process in determining whether or not the Plaintiff was disabled. At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since August 26, 1985. (AR 12). At step two, the ALJ found that the Plaintiff had an impairment which significantly interfered with his ability to perform work-related activities and therefore had a severe impairment in the nature of degenerative disease of the lumbar spine. *Id.* At step three, the ALJ determined that the evidence showed that the claimant's impairment when considered alone or in combination did not meet the severity of the criteria of any one of the listed impairments contained in the Regulations. *Id.* At step four of the sequential process, the ALJ determined that the Plaintiff was not disabled. *Id.* At step four, if a claimant is capable of any past work as generally done throughout the economy or as actually done by the claimant, he cannot be found disabled.

The ALJ first noted that Plaintiff's bladder problems, prostatitis, esophagitis, and atypical chest pain did not constitute impairments that would significantly interfere with Plaintiff's work-related activities. (AR 12–13). Plaintiff does not challenge these findings on appeal.

With respect to Plaintiff's back problems, the ALJ noted that at the hearing, Plaintiff testified that his most significant pain was his back pain. (AR 13). Plaintiff stated that he did not perform any household chores due to his back pain. *Id.* He stated he spends most of his time lying down watching television. *Id.* The ALJ concluded that the Plaintiff's allegation of severe disabling back pain was not supported by the evidence when the evidence is reviewed within the guidelines of Social Security Ruling 88–13. *Id.* The ALJ concluded that the physical examinations were not consistent with severe disabling back pain. *Id.* The ALJ found that the medical testing had not shown a severe disc herniation. *Id.* The ALJ noted that Plaintiff underwent extensive testing in August of 1985, in February of 1986, and much of 1987, and the most recent MRI showed degenerative disc disease of the lumbar spine with no evidence of interverbral disc herniation. *Id.* The physical examination which took place in February of 1986 did not suggest a radicular syndrome. In a physical examination conducted on December 6, 1989, by Dr. Rabinowitz, there was no evidence of nerve root irritation. Even the examination which occurred in August of 1985 when the Plaintiff injured his back showed only mild diffuse tenderness of the lumbar spine. *Id.* The range of motion of the lumbar spine was approximately 25% of normal. Straight leg raising was slightly limited, and there were no neurological deficits. When Dr. Rabinowitz examined Plaintiff in 1989, his gait was normal; grip strength and digital dexterity were unimpaired; and the claimant had no difficulty getting on and off the examining table and had only mild difficulty with heel and toe walking and squatting. *Id.*

The ALJ also noted that Plaintiff's medication was not indicative of severe disabling pain. (AR 14). At the hearing, Plain-

tiff stated he had bad severe back pain approximately once a week. *Id.* He takes Elavil as a muscle relaxer but does not take any pain killers for fear of addiction. *Id.* However, Plaintiff also does not even take aspirin or Tylenol which are non-prescription drugs and are not addictive. *Id.*

The ALJ specifically rejected Dr. Koch's findings that the claimant was unable to adequately perform the duties of any significant occupation. *Id.* The ALJ noted that in a letter dated July 27, 1989, Dr. Koch stated that the claimant was unable to adequately perform the duties of any significant occupation. *Id.* The ALJ observed, however, that Dr. Koch's evaluation was largely based on information provided to him by Plaintiff and may therefore have been biased. *Id.* For example, the claimant told Dr. Koch that he was never out of bed more than four to five hours a day. *Id.* He told Dr. Koch that he stayed in bed 20 to 22 hours a day because of his chronic back pain. *Id.* The ALJ noted that with such information a doctor could virtually conclude disability, provided the information was accurate. *Id.* However, none of this information was supported by laboratory testing and physical examinations, and the ALJ concluded that all of the information was self serving and highly suspect.

The ALJ also concluded that Plaintiff's testimony regarding his severe disabling back pain was not credible in light of Plaintiff's statement of his own activities. *Id.* The ALJ noted that although Plaintiff stated he did very little, he did indicate that he went fishing although Plaintiff stated that his son put the boat in the river for him. *Id.* Plaintiff gave conflicting testimony with regard to how long he went fishing. *Id.* At one point, he stated he only fished for two hours, and at another point, he stated he fished all day and only caught two fish. *Id.* The ALJ noted that if the Plaintiff were fishing from a boat, he would not be able to stand up and relieve any back pain or stiffness. *Id.* The ALJ therefore concluded that the Plaintiff's allegations of severe disabling back pain were not supported by the results of laboratory testing, physical examinations, medication, or his testimony with regard to his own activities and were not fully credible. *Id.*

After reviewing the evidence, the ALJ concluded that the Plaintiff would be able to perform prolonged walking, prolonged standing, and prolonged sitting. *Id.* The ALJ concluded that Plaintiff would be able to occasionally lift 50 pounds and could frequently lift and carry 25 pounds. *Id.* The ALJ found that Plaintiff's only severe impairment was his back pain, the degree of which was not supported by laboratory testing. *Id.* The ALJ noted that physical examinations of the Plaintiff had shown that Plaintiff was able to perform all orthopedic maneuvers. Therefore, the ALJ concluded that the Plaintiff retained residual functional capacity to perform the full range of medium work. *Id.* The ALJ noted that in Plaintiff's description of his job as a machine operator, the Plaintiff stated that the most he had to lift was 50 to 60 pounds, but that was with a hoist. *Id.* Plaintiff also stated that the job required him to stand all day. *Id.* The ALJ noted that the lifting Plaintiff had to do with the hoist was equivalent to lifting a lot less than the 50 or 60 pounds. *Id.* Therefore, the ALJ concluded that Plaintiff retained his residual functional capacity to perform his past relevant work as a machine operator, and therefore must be found not to be disabled within the meaning of the Social Security Act. *Id.*

## THE ALJ'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff argues that the ALJ's decision that Plaintiff was able to perform his past relevant work as a machine operator is not supported by substantial evidence and must be reversed. Plaintiff attacks the decision on the following bases: (1) the ALJ erred in relying on the Residual Functional Capacity Assessment performed by Dr. Graham and vocational report performed by Jim Anderson; (2) the ALJ improperly rejected the findings of Plaintiff's treating physicians, in particular the findings of Dr. Koch; (3) the ALJ improperly rejected Plaintiff's complaints of pain; (4)

the ALJ erred in describing Plaintiff's past work as medium work.

I. *The ALJ's Determination that Plaintiff Could Perform the Full Range of Medium Work is Supported by Substantial Evidence.*

Plaintiff's primary allegation on this appeal is that he is disabled due to his chronic back pain, which he alleges is the result of degenerative disease of the spine. The ALJ determined that Plaintiff's testimony that he experienced severe, disabling pain that would prevent him from performing medium work was not supported by the laboratory and physical examinations, Plaintiff's medication, or his testimony regarding his activities and was not fully credible. The ALJ determined that Plaintiff's problems, including his alleged back pain, did not prevent him from performing the full range of medium work. The ALJ's decision is supported by substantial evidence.

█ Plaintiff argues that the ALJ's determination that Plaintiff could perform the full range of work requiring medium exertion is contrary to the medical evidence of record, particularly to the opinion of treating physician Dr. Koch. Plaintiff acknowledges that the finding is consistent with the RFC assessment performed by Dr. James Graham, but argues that Dr. Graham's assessment must be rejected because Dr. Graham is a colon and rectal specialist and is old and because Dr. Graham never personally examined Plaintiff. Plaintiff contends that he is unable to perform the duties of medium work because his back condition causes him severe and disabling pain.

Dr. Graham's assessment should not be rejected on either of the bases proposed by Plaintiff. The fact that Dr. Graham is old does not affect his ability to give a correct medical opinion; nor does the fact that Dr. Graham is a colon and rectal specialist mean that he is not competent to give an opinion regarding the limitations imposed upon Plaintiff due to his back problems.[7] Nothing in the Social Security Act or the Regulations requires that medical experts designated by the Secretary be specialists in the area in which they are asked to opine.[8] Dr. Graham reviewed the medical evidence regarding Plaintiff's degenerative back disease, Plaintiff's range of motion, and the neurological findings, and opined that the normal neurological findings and unremarkable x-rays for Plaintiff's age indicated that pain should be minimal and spinal motion should not be less than normal. (AR 111).

Plaintiff contends that Dr. Graham's assessment and the ALJ's determination are contrary to the opinions of the treating and examining physicians, particularly Dr. Koch, whose opinion the ALJ rejected. Neither Dr. Graham's determination or the ALJ's determination is contrary to the medical evidence of record. As stated above, Dr. Graham's assessment specifically relies on certain reports of the treating physicians. While the medical record is replete with Plaintiff's subjective complaints of pain, and clearly evidences that Plaintiff suffered from degenerative disease of the spine, none of the treating physicians, other than Dr. Koch, gave an opinion as to whether the medical evidence supported the degree of pain claimed by Plaintiff, or how Plaintiff's back problems would limit his ability to work. Dr. Graham found that

---

**7.** That Dr. Graham was not a specialist in the area of back problems is a factor that the ALJ could consider in determining the weight to be given to Dr. Graham's assessment. However, in light of the fact that the only assessment that conflicted with Dr. Graham's findings was that of Dr. Koch, whose findings were suspect, for the reasons stated *infra,* the ALJ need not have discounted Dr. Graham's findings based on Dr. Koch's.

**8.** Plaintiff makes much of the fact that Dr. Graham stated in the RFC assessment that there

were no treating or examining source statements regarding Plaintiff's physical capacities. It is unclear what Dr. Graham meant by this statement. If he meant that no treating or examining physician had performed an RFC assessment, then his statement is correct. In any event, it is immaterial because it is clear from reading the RFC assessment that Dr. Graham's opinion as to Plaintiff's limitations is based upon the medical evidence of record, and the report specifically refers to the statements of the treating and examining physicians.

the medical evidence regarding the nature of Plaintiff's back problems did not support Plaintiff's claims as to the severity of the pain and degree of physical limitation suffered by Plaintiff. The Court cannot conclude that Dr. Graham's opinion was inconsistent with the reports of the treating physicians (other than Dr. Koch).

Further, the ALJ relied on additional pieces of the medical evidence of record in determining that Plaintiff's back problems and pain were not disabling. The ALJ noted that the most recent MRI showed degenerative disc disease of the lumbar spine with no evidence of intervertebral disc herniation, that the February 1986 examination did not suggest radicular syndrome, and that even the August 1985 examination showed only mild diffused tenderness of the lumbar spine, straight leg lifting was only slightly limited and there were no neurological deficits.[9] (AR 13). Also, the December 1989 examination by Dr. Rabinowitz showed no evidence of nerve root irritation. Plaintiff's gait was normal, he had no difficulty getting on and off the table, and he had only mild difficulty with heel and toe walking and squatting. *Id.* The ALJ also observed that Plaintiff has not been prescribed any painkillers for his allegedly disabling pain. Although he claims that he refuses to take painkillers for fear of addiction, Plaintiff does not take aspirin or Tylenol to attempt to relieve the pain.

■ Dr. Koch, a treating physician, opined that Plaintiff was unable to adequately perform the duties of any significant occupation, in a July 27, 1989, letter to an insurance company. However, as the ALJ observed, Dr. Koch's evaluation was largely based on information provided to him by Plaintiff, and was not supported by laboratory testing and physical examinations. *Id.* The ALJ rejected Dr. Koch's statement as self-serving (for Plaintiff) and highly suspect. The ALJ did not err in rejecting Dr. Koch's opinion.

■ A statement by a treating physician that a claimant is disabled or unable to work is not binding on the ALJ. 20 C.F.R. § 404.1527. Further, the ALJ need not always accept the opinion of the treating physician over a non-examining medical consultant. *DeFrancesco v. Bowen,* 867 F.2d 1040, 1043 (7th Cir.1989). The Seventh Circuit has recognized "the well-known propensity of personal physicians to go the extra step in helping their patients obtain benefits for a medical condition." *Id.*

■ Dr. Koch's notes do not indicate that Dr. Koch ever treated Plaintiff for his back condition. (AR 151–164). The only objective evidence regarding Plaintiff's back condition that appears to have been presented to Dr. Koch was an x-ray report relating to Plaintiff's heart, which also showed the spine. (AR 164). Dr. Koch's letter appears to be based on Plaintiff's own subjective complaints that pain disabled him such that he could not get out of bed more than four or five hours a day. (AR 157–58). Dr. Koch's diagnosis was not based on acceptable clinical and laboratory tests, and the ALJ did not err in rejecting it. *Veal v. Bowen,* 833 F.2d 693, 699 (7th Cir.1987). Further, Dr. Koch's opinion was contrary to Dr. Graham's opinion based on the other medical evidence of record indicating that Plaintiff's back problems were not so severe as to be reasonably expected to produce the degree of pain complained of by Plaintiff. It is up to the ALJ to resolve conflicts in the medical evidence. *DeFrancesco,* 867 F.2d at 1043; *Kapusta v. Sullivan,* 900 F.2d 94, 97 (7th Cir.1990).

Although Plaintiff here does have a history of back problems, the ALJ found that the severity of the pain complained of by Plaintiff was not supported by the objective medical evidence. The Social Security Act states that:

An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical

---

9. Plaintiff also testified that one of his treating physicians was going to perform surgery on him, but then told Plaintiff that he would not operate unless Plaintiff's back condition worsened to the point that he could not walk. The medical records contain no mention of this.

signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability. 42 U.S.C. § 423.

The Regulations provide that "[w]e will never find that you are disabled based on your symptoms, including pain, unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce those symptoms," and although no longer strictly applicable, this standard has been specifically endorsed by Congress. 20 C.F.R. § 404.1529; *Moothart v. Bowen*, 934 F.2d 114, 116 (7th Cir. 1991). Further, Social Security Ruling 88–13, which was relied on by the ALJ, states that "[p]ain cannot be found to have a significant effect on a disability determination or decision unless medical signs or laboratory findings show that a medically determinable physical or mental impairment is present that could reasonably be expected to produce the pain alleged." SSR 88–13. The Seventh Circuit has stated that "[d]espite a paucity of objective medical evidence directly supporting a disability, the claimant may prove that she is 'disabled' within the meaning of the SSA by subjective complaints if she shows: 1) evidence of an objectively adduced abnormality *and either* 2) objective medical evidence supporting the subjective complaints issuing from that abnormality, *or* 3) that

the abnormality is of a nature in which it is reasonable to conclude that the subjective complaints are a result of that condition." *Veal*, 833 F.2d at 698. Plaintiff fails to satisfy that burden here, as the ALJ could and did find that neither the objective medical evidence regarding Plaintiff's back problems nor the nature of Plaintiff's back problems support Plaintiff's contentions as to the degree of pain experienced and the physical limitations placed upon him.

Along the same lines, Plaintiff contends that the ALJ erred in not crediting his subjective complaints of pain. Plaintiff testified at the hearing that he is down for an average of 18 hours a day, and that his back hurts him all the time if he tries to do something. (AR 33). Plaintiff testified that he has his bad times every few weeks where he has to continually lie down for three or four days. (AR 34–35). Plaintiff also testified that in a typical day, he gets up in the morning, eats breakfast, drives over to a friend's house, sits and talks a bit, and then drives home to lie down and watch TV. (AR 40). When his wife gets home from work, he gets up and talks to her for a while, eats dinner, and then goes back to bed. (AR 41–42). Plaintiff also testified that from time to time for recreation he goes out fishing with his wife, visits friends, and he took a trip 170 miles to visit a relative and do some fishing. (AR 42–44). The ALJ found that Plaintiff's allegations as to the severe and disabling nature of his pain and his activities were not fully credible. The ALJ noted that with respect to one of his fishing trips, Plaintiff had said that he fished all day and did not catch anything while his wife's arms were sore from catching fish. He then corrected himself to state that all day meant two hours. The ALJ noted that if Plaintiff were out on a boat fishing, he would not be able to stand up and relieve any stiffness in his back. (AR 14). It should also be noted that with respect to the fishing, Plaintiff initially said that he put the boat in, but was corrected by his wife, who said that Plaintiff's sons put the boat in. (AR 42). Further, Plaintiff stated on Social Security forms that he could at-

tend church, stand, walk, have a good appetite, climb stairs, drive a car, ride in a car, and visit other people. (AR 179).

The ALJ's finding that Plaintiff's testimony as to the severity of his pain was not fully credible was based on the laboratory testing and physical examinations, Plaintiff's medication, and Plaintiff's testimony with regard to his activities. (AR 14). "An ALJ's credibility determinations will be affirmed on appeal unless the appellant can demonstrate that they are 'patently wrong.' " *Herr v. Sullivan,* 912 F.2d 178, 182 (7th Cir.1990) (quoting *Kelly v. Sullivan,* 890 F.2d 961, 965 (7th Cir.1989)). Plaintiff fails to meet this burden.

## II. *The ALJ Did Not Err In Describing Plaintiff's Past Work As Medium Work.*

The regulations state that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Plaintiff argues that his past Caterpillar work as a gear hobber was exertionally heavy. Plaintiff also argues that his past work as a lathe operator was exertionally heavy as performed by him because he lifted heavy pieces that probably weighed 50 or 60 pounds by hand, although there was an overhead crane or hoist because of production requirements. (AR 29). However, Plaintiff testified at the hearing that he was not required to lift these objects by hand, and that if he used the hoist, the most he would have to lift would be certain tooling which weighed 25 to 30 pounds. (AR 30).

Social Security Ruling 82-61 states that a claimant will not be found to be disabled when he retains the residual functional capacity to perform:

1. The actual functional demands and job duties of a particular past relevant job; or

2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy. SSR 82-61; *See also*

*Orlando v. Heckler,* 776 F.2d 209 (7th Cir.1985).

Plaintiff argues that the ALJ erred in determining that his past work was exertionally medium because the job as *actually* performed by the Plaintiff was heavy work. The Secretary argues that Plaintiff's past work was exertionally medium because the job as Plaintiff was *required* to perform it was exertionally medium. Plaintiff's argument does find some support in the language of SSR 82-61, which states that one of the tests for determining whether or not a claimant retains the capacity to perform his past relevant work is "[w]hether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it." SSR 82-61. However, cases relying on the Ruling seem to focus on what the actual responsibilities of a claimant's past job require him or her to do. *See e.g., Steward v. Bowen,* 858 F.2d 1295, 1300-01 (7th Cir. 1988).

The Court concludes that in determining whether Plaintiff retains the residual functional capacity to perform his past work, the appropriate focus should be on those job duties that Plaintiff was required to perform as a condition of employment, and not what Plaintiff chose to do of his own volition. Having said this, the Court notes that although Plaintiff stated that he was not required to lift the 50 to 60 pound pieces by hand, he also testified that he did so because of Caterpillar's production requirements. The ALJ never followed up on this point. If Plaintiff could not meet production requirements without lifting the pieces by hand and therefore could not satisfactorily perform his job without lifting the pieces by hand, then he is not able to perform his past job as lathe operator at Caterpillar, and the ALJ erred in finding that such work was medium work to which Plaintiff could return.

However, the fact that the ALJ might have been incorrect in determining that Plaintiff's past relevant work was medium work to which Plaintiff could return does not require a remand in this case.

*Steward,* 858 F.2d at 1295; *Arbogast v. Bowen,* 860 F.2d 1400, 1405 n. 6 (7th Cir. 1988). As noted by the Secretary, Plaintiff is not disabled under 20 C.F.R. § 404.-1527(e) if he can perform either his past job, or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82–61; *Orlando,* 776 F.2d at 215. In determining if Plaintiff can perform a particular job as it is generally performed in the national economy, the Secretary may rely on the Dictionary of Occupational Titles published by the Department of Labor. *Steward,* 858 F.2d at 1301; *Arbogast,* 860 F.2d at 1405 n. 6; *see also* 20 C.F.R. § 404.1566(d). Here, vocational specialist Anderson stated that the job of Engine Lathe Set-up Operator (machine shop) described in the Dictionary closely resembled the Lathe Operator job performed by Plaintiff for 13 years. (AR 62). The Engine Lathe Set–Up Operator job, as generally performed in the national economy, requires only medium work activity. Further, the Dictionary lists Plaintiff's past work of Lathe Operator and Gear Cutting Machine Operator, Production, as exertionally medium, as was noted by vocational expert Erickson. (AR 191). Accordingly, Plaintiff could perform the job duties of his occupation as generally required by employees throughout the national economy. The Court concludes that the ALJ's finding that Plaintiff can perform his past relevant work is supported by substantial evidence.

■■■■ Finally, Plaintiff argues that he should be found disabled because Caterpillar has "deemed the claimant unable to perform his past work at Caterpillar, and the claimant is on workers' compensation from Caterpillar as a result of this fact ... Caterpillar ... has not allowed the Plaintiff to return to his work as a machine operator." (Motion for Summary Reversal, at 13). The Court is not quite sure what Plaintiff means by the statement that Caterpillar has not allowed the Plaintiff to return to work. There is nothing in the record to indicate that Caterpillar has or would refuse to allow Plaintiff to return to work based on his back problems. In any event, the determination of Caterpillar or any agency that Plaintiff was entitled to workers' compensation is not binding on the Secretary in determining whether Plaintiff is disabled under the Social Security Act. 20 C.F.R. 404.1504 (1991). Further, in light of the fact that the evidence indicates that Plaintiff could perform his past relevant work as it generally exists in the national economy, the fact that Caterpillar might refuse to reinstate Plaintiff would be irrelevant.

## CONCLUSION

Accordingly, the Plaintiff's Motion For Summary Reversal is DENIED, and the Secretary's Motion To Affirm is GRANTED. The Clerk is instructed to enter final judgment in favor of Defendant and against Plaintiff.